NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0784n.06
Filed: November 8, 2007

No. 05-2300

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| THEODORE G. WILLIAMS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| WILLIAM MEYER, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Before: CLAY and GIBBONS, Circuit Judges; and HOOD, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Petitioner-appellant Theodore G. Williams

appeals the district court's order denying his petition for writ of habeas corpus. Williams is currently

the only person still confined in a psychiatric facility pursuant to Michigan's now-repealed Criminal

Sexual Psychopath Act ("CSPA"), Mich. Comp. Laws § 780.501-.509 (1968), *repealed by* 1968

_____

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

-1-

Mich. Pub. Acts 143 (Aug. 1, 1968). Williams claims that his continued confinement violates the Equal Protection Clause and the Due Process Clause of the United States Constitution. For the following reasons, we affirm the district court's decision.

I.

Until its repeal, effective August 1, 1968, the CSPA provided that a criminal defendant in Michigan who was designated a "criminal sexual psychopathic person" would be committed to the custody of the state hospital commission to be confined in an appropriate state institution. § 780.505. A criminal sexual psychopathic person was defined as "[a]ny person who is suffering from a mental disorder and is not feeble-minded, which mental disorder is coupled with criminal propensities to the commission of sexual offenses." § 780.501. After the CSPA was repealed, the Michigan Supreme Court ordered that the discharge of persons in custody pursuant to the Act would continue to be governed by the Act's discharge provisions until further legislative clarification. Admin. Order 1969-4, 382 Mich. xxix (1969). Because no clarification ever occurred, the Act's discharge provisions have continued to apply to such persons. Under those provisions (section 7 of the Act as enacted), a person in custody "shall be discharged only after there are reasonable grounds to believe that such person has recovered from such psychopathy to a degree that he will not be a menace to others." Mich. Comp. Laws § 780.507 (1968).

With the exception of persons committed pursuant to the CSPA, Michigan's Mental Health Code ("MHC") governs the commitment and discharge of persons in the custody of the Michigan Department of Mental Health. Mich. Comp. Laws § 330.2050(5). Under the MHC, a person must be discharged when "the patient's mental condition is such that he or she no longer meets the criteria of a person requiring treatment." § 330.1476(2). A "person requiring treatment" is defined as an

-2-

individual "who has mental illness" and (1) who as a result of that illness can reasonably be expected within the near future to intentionally or unintentionally seriously injure himself or herself or another individual; (2) who as a result of that illness is unable to attend to his or her basic physical needs necessary to avoid serious harm in the near future; or (3) whose judgment is so impaired that he or she is unable to understand the need for treatment and whose continued behavior can reasonably be expected, on the basis of competent clinical opinion, to result in significant physical harm to himself or herself or others. § 330.1401. Mental illness is defined as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." § 330.1400(g).

This case was the subject of a prior appeal to this court, and the facts of Williams's case are set forth in our opinion in that appeal:

> In October 1967, Theodore Williams, the petitioner, entered a plea of guilty in Michigan state court to a charge of first degree murder. Prior to sentencing, Williams was designated a "criminal sexual psychopath," under the then-applicable [CSPA], and committed to the custody of a state mental hospital. He was initially discharged in September 1973, but he was returned to custody in 1979, following a determination by the Michigan Supreme Court that he had been improperly released. *See People v. Williams*, 406 Mich. 909 (1979). From then until the present, he has remained in the custody of the Michigan Department of Mental Health. He has filed a number of petitions for discharge pursuant to section 7 of the repealed [CSPA], all of which have been denied. Today, he is the only person remaining in the custody of the Michigan Department of Mental Health who was committed under, and whose discharge is governed by, the [CSPA].
>
> . . . .
>
> The present action began with the petition for discharge Williams filed on September 19, 1991. In addition to seeking discharge under section 7 of the [CSPA], Williams contended that the application of section 7 violated his constitutional rights to due process and equal protection. On July 29, 1993, the state circuit court rejected Williams' constitutional challenges. JA 77-100 (*People v. Williams,* No. 67-4411 FY (Allegan County, Mich. Cir. Ct. July 29, 1993)). On June 13, 1994, at the conclusion

of a series of evidentiary hearings, it orally denied Williams' petition. A subsequent written order stated that "it was established by clear and convincing evidence that the defendant has not recovered from his criminal sexual psychopathy to a degree that he will not be a menace to others." JA 103.

The Michigan Court of Appeals affirmed. It ruled that the constitutional challenges were without merit and that the circuit court had not clearly erred in denying discharge. *See* JA 105-111 (*People v. Williams,* 228 Mich.App. 546, 580 N.W.2d 438, 441-44 (1998)). On November 24, 1998, the Michigan Supreme Court denied Williams' application for leave to appeal. *See People v. Williams,* 459 Mich. 914, 589 N.W.2d 287 (1998).

*Williams v. Meyer* (*Williams I*), 346 F.3d 607, 610-11 (6th Cir. 2003) (footnote omitted).

In 1993, Williams filed a petition in federal district court seeking habeas relief under 28 U.S.C. § 2254. The district court dismissed the petition without prejudice, pending final resolution of the proceedings in state court. The district court granted Williams's motion to reopen the case in 1999. After a magistrate judge issued a report and recommendation on his claims, Williams failed to file timely objections, and the district court accepted the magistrate's report and recommendation and denied Williams's petition for habeas relief. *Williams*, 346 F.3d at 612. After the district court denied Williams's motion for relief from judgment under Fed. R. Civ. P. 60(b), Williams appealed. *Id.* This court reversed the district court and remanded the case for the district court to consider Williams's objections to the magistrate's report and recommendation. *Id.* at 617. After consideration of Williams's objections to the original report and recommendation, the magistrate issued a new report and recommendation concluding that Williams's petition should be dismissed. The district court adopted the report and recommendation and Williams timely appealed.

II.

Williams argues that it violates the Equal Protection Clause to require him to satisfy the release provisions of the CSPA, rather than the different provisions under the MHC that govern the

-4-

release of persons hospitalized after being found not guilty by reason of insanity ("insanity acquittees"). "The Equal Protection Clause prohibits states from making 'distinctions which either burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference.'" *Wilson v. Morgan*, 477 F.3d 326, 333 (6th Cir. 2007) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)).

The parties disagree as to the level of scrutiny with which the court should examine the legitimacy of any difference in classification. Williams argues that strict scrutiny should apply because the classification burdens a fundamental right, that of freedom from physical restraint. He relies exclusively on the plurality opinion in *Foucha v. Louisiana*, 504 U.S. 71, 85-86 (1992) (plurality opinion). Even if *Foucha* were precedential, which Williams concedes is not the case, it would not control this case because Williams is not physically restrained based upon the classification he challenges.[1] In *Foucha*, the plurality examined the differing treatment of insanity acquittees who were no longer insane and criminals who had completed their prison terms. *Id.* at 85. Based upon this classification, the former could be confined indefinitely until they proved that they were not dangerous, whereas the latter could not be confined, regardless of dangerousness. *Id.* Consequently, the challenged classification determined whether the plaintiff could be physically restrained. Here, Williams challenges the differences between the release provisions under the

---

[1] For the same reason, this court's prior holding in *Williams I*, 346 F.3d at 616 ("Any difference in treatment of involuntary detainees is subject to strict scrutiny."), is not dispositive. In that case, the court was considering the merit of Williams's objections to the magistrate's report in determining whether relief was warranted under Fed. R. Civ. P. 60(b)(1) for his failure to file timely his objections. *See id.* at 613, 614. Under that standard, a claim is "meritorious" if there is "some possibility" of a different outcome. *Id.* at 614. While the possibility that *Foucha* would apply to Williams's claim was sufficient in that context, it does not preclude a contrary decision on the merits.

CSPA and the MHC. Under either statue, Williams can be physically restrained. While, in certain factual situations, the different release provisions might affect Williams's liberty, the challenged classification determines only which procedures apply. The Court has analyzed equal protection challenges based upon the application of differing sets of rules under the rational-basis test, even where liberty may ultimately be at stake. *See Baxstrom v. Herold*, 383 U.S. 107, 111 (1966) (applying rational-basis test to differential treatment between the civilly and criminally insane); *Minnesota ex rel. Pearson v. Probate Ct. of Ramsey County, Minn.*, 309 U.S. 270, 274-75 (1940) (applying rational-basis test to differential treatment of sexual psychopaths); *see also Foucha*, 504 U.S. at 79 ("Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed.") (citing *Jones v. United States*, 463 U.S. 354, 368 (1983), and *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)); *Jones*, 463 U.S. at 370 (noting the "reasonably held view that insanity acquittees constitute a special class that should be treated differently from other candidates for commitment"). Therefore, the court applies rational-basis review.

Applying this standard, it is clear that Michigan has a rational basis for treating Williams differently from insanity acquitees. An insanity acquittee has not been convicted and, consequently, may not be punished, *Jones*, 463 U.S. at 369. Williams, however, was convicted of first degree murder, making him eligible for whatever punishment is authorized by statute, *see Chapman v. United States*, 500 U.S. 453, 465 (1991). This dichotomy is further reflected in the differing rationales for committing rather than incarcerating insanity acquittees versus criminal sexual psychopaths. Insanity acquittees are not criminally responsible because they do not appreciate the wrongfulness of their conduct or cannot conform their conduct to the requirements of the law. *See*

-6-

*People v. Ramsey*, 375 N.W.2d 297, 302 (Mich. 1985). In contrast, persons were committed under the CSPA, not because they lacked criminal responsibility, but because it was hoped that civil commitment would prove more effective "than criminal punishment, the ineffectiveness of which, as a deterrent, had been demonstrated in the behavior of a number of recidivist sex offenders." *People v. Smith*, 275 N.W.2d 466, 469 (Mich. 1979). While Michigan chose to commit and treat Williams rather than punish him, it is still rational for Michigan to distinguish between the release provisions for sex offenders who have been convicted and those who have not. *See Doe v. Moore*, 410 F.3d 1337, 1347 (11th Cir. 2005); *cf. Doe XIV v. Mich. Dep't of State Police*, 490 F.3d 491 (6th Cir. 2007) (denying Equal Protection claims grounded in differentiation between similar classifications of sex offenders because such legislative classifications were deemed to serve legitimate government purposes).

III.

Williams also argues that the release provisions of the CSPA do not comport with the due process standards set forth in *Kansas v. Hendricks*, 521 U.S. 346 (1997), as clarified by *Kansas v. Crane*, 534 U.S. 407 (2002), and that insufficient evidence was presented to satisfy those standards in this case.

As an initial matter, respondent argues that Williams's confinement cannot violate due process because his conviction for first degree murder eliminated his liberty interest. Therefore, respondent claims "[t]hat the State once set up a regime that substituted an indefinite period of civil commitment for life imprisonment should not implicate a liberty interest regarding the manner in which period of commitment is determined." Respondent offers no citation, perhaps because the argument is directly contrary to Supreme Court precedent. *See Vitek v. Jones*, 445

-7-

U.S. 480, 492 (1980) ("The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement."); *Jackson*, 406 U.S. at 738 ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.").

In *Hendricks*, the Supreme Court held that the requirements of due process were satisfied by a Kansas statute providing for the commitment of persons who have been convicted of or charged with a sexually violent offense and suffer from a mental abnormality or personality disorder that makes them likely to engage in the predatory acts of sexual violence. *Hendricks*, 521 U.S. at 357. In doing so, the court noted that civil commitment statutes have been upheld when "they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.* at 358. The additional factor required by these previously-upheld statutes "serve[d] to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control," *id.*, and distinguished persons subject to civil commitment "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings," *id.* at 360.

In *Crane*, the Court revisited the same Kansas statute to clarify the extent to which the mental abnormality had to render persons subject to commitment unable to control their dangerous behavior. *Crane*, 534 U.S. at 411-12. The Court held that while there was no requirement of total or complete lack of control due to the mental abnormality, "there must be proof of serious difficulty in controlling behavior." *Id.* at 413. As this lack of control "will not be demonstrable with mathematical precision," the Court emphasized that the difficulty controlling behavior,

when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Id.*

Williams argues that the state court did not satisfy the requirements of *Crane* when it determined his continued confinement was proper. Specifically, Williams argues that the state court concluded only that he was "predisposed" to commit future offenses and that this predisposition does not constitute a serious difficulty in controlling behavior. Williams's argument fails on both counts. While it is true that the Michigan Court of Appeals found that the state had proven Williams had a "mental disorder that predisposes him to commit future sex offenses," *People v. Williams*, 580 N.W.2d 438, 443 (Mich Ct. App. 1998), it also found that he "continued to suffer from the antisocial, or sociopathic, personality disorder that *caused* his past crimes," *id.* at 442 (emphasis added); *see also id.* at 443 ("[D]efendant continued to suffer from the personality disorder that *caused* him to commit the sexual assaults and killings . . . .") (emphasis added). Furthermore, the Supreme Court concluded that a condition "which *predisposes* the person to commit sexually violent offenses," Kan. Stat. Ann. § 59-29a02(b) (emphasis added), constituted a "mental condition or personality disorder that makes it difficult, if not impossible, for the person to control his dangerous behavior," *Hendricks*, 521 U.S. at 358 (citing Kan. Stat. Ann. § 59-29a02(b)). These findings satisfy the requirements of *Crane* because the typical recidivist convicted in an ordinary criminal case neither suffers from such a mental condition nor is influenced or caused to reoffend by such a mental condition.

Williams next argues that the CSPA does not satisfy the requirements of *Hendricks*

-9-

because it does not require a finding of a likelihood of future dangerousness. Alternatively, Williams argues that even if the CSPA does require such a finding, the state court failed to make such a finding and insufficient evidence exists to support such a finding. Williams makes much of the Supreme Court's statement that "[t]he [Kansas] statute requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated." *Id.* at 357. He argues that "the Court clearly is distinguishing 'likelihood of future conduct' from 'mental abnormality with a volitional impairment,' and seems to be saying that the required finding of both is what satisfies both substantive and procedural due process."

Williams's interpretation of the passage to require a separate showing of likelihood of future conduct is wrong for three reasons. First, it is clear that this statement is describing the requirements of the Kansas statute, not the minimum requirements of due process. Second, the *Hendricks* opinion itself explains the meaning of the statement in question. Immediately after noting what the Kansas statute requires, the subsequent paragraphs explain how each of these requirements comports with the Court's prior precedent. The first subsequent paragraph addresses the evidence of past violent behavior, and the next paragraph addresses the mental conditions create a likelihood of future violent conduct because they impair volition. *See id.* at 357-58. There is no further mention of Williams's imagined likelihood-of-future-conduct requirement. Third, in *Crane*, when the Supreme Court recounted the holding of *Hendricks* in great detail and stated the characteristics of commitment statutes that satisfy due process, there is no mention of a "likelihood" requirement. *See Crane*, 534 U.S. 409-10. In fact, no form of the word "likely" appears in the majority opinion at all.

-10-

In fact, *Hendricks* and *Crane* explain exactly why Williams's confinement satisfies due process requirements. The state courts made a finding of dangerousness. *Williams*, 580 N.W.2d at 442-43; *see Hendricks*, 521 U.S. at 357. The finding of dangerousness was supported by evidence of past sexually violent behavior. *Williams*, 580 N.W.2d at 439-40; *see Hendricks*, 521 U.S. at 357-58. The finding of dangerousness was coupled with proof of an additional mental abnormality that creates a likelihood of future violent conduct because it impairs volition. *Williams*, 580 N.W.2d at 442-43; *see Hendricks*, 521 U.S. at 358. The state courts found that the mental abnormality constituted a serious difficulty in controlling dangerous behavior. *Williams*, 580 N.W.2d at 442; *see Crane*, 534 U.S. at 413.

IV.

For the foregoing reasons, we affirm the district court's decision.